**In re Lynn ESDEN, Individually and on Behalf of All Others Similarly Situated, Plaintiff,**

v.

**The RETIREMENT PLAN OF THE FIRST NATIONAL BANK OF BOSTON and Certain Affiliated Companies, Defendant.**

No. 2:97–CV–114.

United States District Court, D. Vermont.

Sept. 28, 1998.

Jerome Frederick O'Neill, O'Neill, Crawford & Green, Burlington, VT, Steven A. Katz, Martin L. Perron, Carr, Korein, Tillery, Kunin, Montroy, Cates & Glass, Belleville, IL, Allen C. Engerman, Law Offices of Allen C., Engerman, P.A., Boca Raton, FL, for Plaintiff.

Samuel Hoar, Jr., Shapleigh Smith, Jr., Dinse, Knapp & McAndrew, P.C., Burlington, VT, George Marshall Moriarty, Jonathan M. Zorn, Crystal D. Talley, Ropes & Gray, Boston, MA, for Defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

On April 21, 1998, Lynn Esden filed a first amended class action complaint ("Amended Complaint"), alleging that "[t]he Retirement Plan of The First National Bank of Boston and certain affiliated companies" ("Retirement Plan") violated the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et. seq.* ("ERISA") by miscalculating the benefits due to plan participants who elected to receive accrued benefits in a lump sum. Esden contends specifically that participants in the Retirement Plan received less than the present value of their normal retirement benefit, as required by ERISA § 203(e)(2) (as interpreted by Treasury Regulation 1.417(e)–1(d)) and that this conduct resulted in an impermissible forfei-

ture of the participants' benefits under Treasury Regulation 1.411(a).

On August 31, 1998, the Court conditionally certified this case as a class action under Rule 23(b)(1) and (b)(2). Both parties have filed Motions for Summary Judgment pursuant to Fed.R.Civ.P. 56. For the reasons discussed below, the Retirement Plan's Motion for Summary Judgment is GRANTED and Esden's Motion for Summary Judgment is DENIED. The conditions attached to class certification are removed, and this case is unconditionally certified as a class action under Rule 23(b)(1).

I. Factual Background.

As undisputed by the parties, the material facts are as follows. Plaintiff Esden, a Vermont resident, was employed by Bank of Vermont and was a vested participant in the Bank's defined benefit plan until December 7, 1990.[1] The Bank of Vermont maintained a separate retirement plan for its employees until October 1, 1989. On that date, the Bank of Vermont retirement plan was combined with BankBoston's cash balance defined benefit plan, and Bank of Vermont employees were given credit for earlier years of service to Bank of Vermont.

As explained in the brochure that was distributed to employees, with the new Cash Balance Plan, employees would be able to see their benefits grow each year as the Bank credited a percentage of their pay to their Cash Balance Accounts and as interest was credited on those Bank contributions. Paper 32, Exhibit 6. This was in contrast to the prior retirement plan, whose value was "invisible" until the participant reached retirement age. Id.

The employee brochure introducing the new Cash Balance Plan explained that as restructured, the Plan would provide "a higher level of benefit[s] early in an employee's career." Id. The annual Bank contribution to an employee's Cash Balance Account would be determined according to a formula based on the employee's years of service and base salary. Id. The percentage levels would

steadily increase until an employee reached 40 years of service and then stop. For example, an employee with 3–4 years of service would receive a Bank contribution equivalent to 4% of his or her base salary at year-end, an employee with 20–34 years of service would receive a contribution equivalent to 11% of base salary and an employee with 40 years a contribution equivalent to 0%. Id.

Interest on the Bank's annual contributions to an employee's Cash Balance Account would vary each year based on the average three month Treasury Bill rate for the calendar year plus .5%. The interest rate would never fall below 5.5% and would never exceed 10%. Interest credit on the Bank's annual contribution to the Account would be given at the end of the year following the year when the contribution was made. Id. At year end, each Plan participant would receive "an individualized statement" showing his or her current Account balance. Id.

The brochure further explained that all the money in a Cash Balance Account would be available when an employee left the Bank's employ (as long as the employee was vested). Id. The funds would be available as a lump sum or as a monthly annuity. This too was in contrast to the prior retirement plan which normally did not allow vested employees to draw on their "invisible" accrued benefits until they reached at least age 55 and then only as a monthly annuity. Id.

After Esden's termination on December 7, 1990, Esden's attorney called the benefits program director to find out when her accrued benefits under the Plan would be paid. When the program director "led [him] to believe that ... Esden should not expect a pension plan distribution for many months," Esden's attorney sent a letter to the Bank on February 1, 1991, requesting payment of her benefits within sixty days. Paper 32, Exhibit 2.

On February 15, 1991, the Retirement Plan wrote Esden, advising her of her options under the Plan and enclosing a Benefit Notification and Election Form for her to sign. The letter explained that as a terminated vested participant, Esden was eligible

---

1. At the time of Esden's termination, Bank of Vermont was an indirect wholly owned subsid- iary of Bank of Boston Corporation (now Bank- Boston Corporation).

to receive accrued benefits under the prior plan and under the cash balance plan. With respect to each plan, the benefits were expressed as a life annuity and as a lump sum payable at normal retirement (age 65) and as a lump sum payable upon termination. Paper 32, Exhibit 3. Instead of keeping the funds in the Plan until she reached 65, Esden elected to receive the accrued benefits immediately. Paper 32, Exhibit 4. On March 26, 1991, the Plan sent Esden a check in the amount of $5319.66 representing "the lump sum distribution of [her] Retirement Plan benefit." Paper 32, Exhibit 5. The cover letter advised Esden that she was "entitled to no further benefits under the Plan." *Id.*

On October 20, 1995, the National Center for Retirement Benefits ("NCRB") contacted the Human Resources Department of Bank of Vermont on behalf of Esden to request a copy of the Retirement Plan and documentation related to the computation of Esden's lump sum benefit. Bank of Vermont forwarded the inquiry to the Retirement Benefits Department of BankBoston. Paper 19, Exhibit 3. NCRB sent a formal request for documentation to the Retirement Benefits Department of BankBoston on December 20, 1995 and the Department supplied the requested documents to NCRB on December 28, 1995 and January 16, 1996. Paper 19, Exhibits 4 and 5. NCRB filed a claim for additional benefits on Esden's behalf on April 22, 1996 (Paper 41, Exhibit 15) which was denied on September 27, 1996 (Paper 19, Exhibit 6). When NCRB's appeal for additional benefits was denied on September 27, 1996, Esden had exhausted her administrative remedies under the Plan. Amended Complaint, ¶ 20; Answer, ¶ 20.

## II. Procedural Background.

Esden filed her initial class action complaint on April 3, 1997, naming the Retirement Plan and the Bank as Defendants. Esden requested monetary relief in the form of additional benefits on behalf of herself and others who had elected to receive a lump sum distribution that was less than the present value of their normal retirement benefit. Esden also requested equitable relief in the form of a declaratory judgment and other

appropriate relief to prevent the Retirement Plan and the Bank from distributing lump sums less than the present value of normal retirement benefits.

On April 1, 1998, the Court granted the Defendants' motion to dismiss the initial complaint for failure to state a claim for additional benefits against the Bank and gave Esden thirty days to amend the complaint to state a claim for equitable relief against the Bank and to revise the class action allegations to comply with Local Rule 23.1. *See Esden v. Bank of Boston,* 5 F.Supp.2d 214 (D.Vt.1998).

The Amended Complaint was filed on April 21, 1998 (Paper 71) and no longer names the Bank as a Defendant. The class action allegations contained in the Amended Complaint comply with Local Rule 23.1. Both parties have filed Motions for Summary Judgment (Papers 38 and 46), contending that they are entitled to judgment as a matter of law. Oral argument on class certification and a limited evidentiary hearing on Esden's suitability as class representative was held on August 31st. At that time, the Court ruled that the case should be conditionally certified as a class action under Rule 23(b)(1) and (b)(2), subject to consideration of the merits in connection with the disposition of the pending motions for summary judgment.

## III. The Summary Judgment Standard.

Summary judgment may be granted only when the moving party shows that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c). The burden is on the moving. party to show that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"As a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion ..." *Bay v. Times Mirror Magazines, Inc.,* 936 F.2d 112, 116 (2d Cir.1991). *See also Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988).

"There is no genuine issue of material fact where a rational trier, viewing the evidence in the light most favorable to the nonmoving party, could not find in favor of that party." *Gonyea v. John Hancock Mutual Life Insurance Co.*, 812 F.Supp. 445 (D.Vt.1993) (citations omitted). "When faced with cross-motions for summary judgment, a district court ... must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *DeVito v. Pension Plan of Local 819*, 975 F.Supp. 258, 262 (S.D.N.Y.1997) (citations omitted).

In the instant case, the parties have agreed that the material facts, as set forth above, are undisputed. The questions that remain unresolved present questions of law that are appropriate to address in the context of the cross-motions for summary judgment.

## IV. Whether Esden's claim is time-barred.

■ Under ERISA, no statute of limitations is stipulated for non-fiduciary claims, such as Esden's. *Miles v. New York State Teamsters Conference Pension Plan*, 698 F.2d 593, 598 (2d Cir.), *cert. denied*, 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983). In the absence of an applicable federal statute of limitations, the Court must choose the limitations period from a state statute governing analogous claims. *Id.*

In this case, both parties are agreed that the appropriate reference is the statute of limitations applicable to contracts in Massachusetts, the law identified in the Retirement Plan as the state law governing interpretation of the Plan's provisions. Paper 41, Exhibit 1, § 13.11. In Massachusetts, a six-year statute of limitations is applicable to contract disputes.[2] Mass.G.L. c. 260, § 2. *See also*

*Greene v. K–Mart Corp. Employee's Retirement Pension Plan*, 1986 WL 15473, *1 (D.Mass.1986) (applying six-year statute of limitations to non-fiduciary ERISA claim).

■ The six-year statute of limitations begins to run "when there has been a clear repudiation by the fiduciary which is clear and made known to the beneficiaries." *Larsen v. NMU Pension Trust*, 902 F.2d 1069, 1073 (2d Cir.1990) (quoting *Miles v. New York State Teamsters Conference Pension Plan*, 698 F.2d at 598 (internal quotations omitted)).

■ The Retirement Plan claims that Esden's claims are time-barred because the letter she received from the Retirement Plan on March 26, 1991, enclosing a check for her accrued benefits, unequivocally stated that she was "entitled to no further benefits under the Plan ." Paper 32, Exhibit 5. If the six-year statute of limitations started running on March 26, 1991, then Esden's claim is time-barred for her complaint was not filed until April 3, 1997.

The Retirement Plan contends that William Robinson's letter of February 1, 1991 was a request for additional benefits on Esden's behalf which was "clearly repudiated" when the Plan advised Esden on March 26, 1991 that she was entitled to no further benefits. The documents, however, speak for themselves. Robinson's February 1, 1991 letter was intended to expedite the payment of Esden's benefits under the Plan—not to request additional benefits. Paper 32, Exhibit 2.

In fact, it was not until February 15, 1991 that the Retirement Plan advised Esden of her options under the Plan, *i.e.*, the dollar amount of her benefits if she chose to receive a lump sum distribution as compared to the estimated dollar amount of her benefits at age 65 if she chose to wait until normal

---

2. We note that Esden's claim is for equitable relief as well as for additional benefits under the Plan. Although the state statute of limitations for contracts has rarely been applied to claims for equitable relief, courts in this Circuit have applied a contractual statute of limitations to claims for equitable relief which are integrally related to the contractual claim. *Carollo v. Cement and Concrete Workers District Council Pension Plan*, 964 F.Supp. 677, 688 (E.D.N.Y.1997)

(holding that New York's six-year contractual statute of limitations applies to claims for equitable relief asking for reformation of a qualified defined benefits plan and recalculation of the plaintiff's benefits). *See also Hendrickson v.. Sears*, 365 Mass. 83, 85, 310 N.E.2d 131 (1974) (in the absence of an express limitation period, a court should look to the "gist of the action or the essential nature of the plaintiff's claim").

retirement age to receive her accrued benefits as a lump sum or monthly annuity. Paper 32, Exhibit 3.

Esden did not claim additional benefits under the Retirement Plan until April 22, 1996 when NCRB filed a claim on her behalf. Paper 41, Exhibit 15. The six-year statute of limitations did not begin to run until the Plan denied the claim on September 27, 1996 (Paper 19, Exhibit 6)—the first juncture at which the Retirement Plan could be said to have clearly and unequivocally repudiated the claim. *See Larsen v. NMU Pension Trust*, 902 F.2d at 1073. *See also Miles v. New York State Teamsters Conference Pension Plan*, 698 F.2d at 598. The Court finds, therefore, that Esden's initial complaint was filed well within the applicable six year statute of limitations.

V. Whether the Retirement Plan paid Esden less than the present value of her normal retirement benefit.

■ Treasury Regulation § 1.417(e)–1 generally provides that a benefit plan must satisfy certain requirements, including those relating to the determination of present value, in order for plan distributions to be accorded tax-deferred treatment. Treasury Regulation 1.417(e)–1(d) requires a defined benefit plan to determine the present value of any accrued benefit by using the interest rates that would be used by the Pension Benefit Guaranty Corporation ("PBGC") (the so-called "Section 417 interest rate"). Subsection (d) of Regulation 1.417(e)–1 also states that the present value of any optional form of benefit, such as a pre-retirement lump sum distribution, cannot be less than the present value of the participant's "normal retirement benefit." IRC § 411(a)(9) defines "normal retirement benefit" as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age."

Esden contends that the Retirement Plan should have paid her the present value of the benefit that she would have received under the plan commencing at normal retirement age ($7,086.83 expressed as a lump sum or

$67.92 expressed as a life annuity). Amended Complaint, ¶ 34; Paper 32, Exhibit 3. This was more than (or the greater of) her early retirement benefit under the Plan—the current balance in her Cash Balance Account ($1,547.73). *Id.*

The question raised by the pending motions for summary judgment is whether the Retirement Plan stipulated the correct method for computing the present value of a vested participant's "normal retirement benefit." Neither party disputes the method used. The Plan and Plan Guidelines set forth three steps in computing the present value of a participant's normal retirement benefit. First, the current balance in the participant's Cash Balance Account is projected ("trended") forward at a rate of 4% to age 65. Second, the projected balance is then converted to the actuarial equivalent of an annuity using certain actuarial assumptions. Third, the actuarial annuity is discounted to present value at an interest rate prescribed by the Pension Benefit Guaranty Corporation ("PBGC"). Paper 41 (Parker Affidavit), Exhibit 1. When compared with the current balance in the Cash Balance Account, the current balance has always exceeded the present value of the actuarial annuity. Paper 40 (Bernier Affidavit), ¶ 8; Paper 48 (Ritter Affidavit), ¶ 13.

Esden's quarrel is with the percentage rate used in step one of the computation. She contends that in projecting forward the current balance in the Cash Balance Account, the Retirement Plan should have used, at a minimum, an interest rate of 5.5%.

This was the rate used to project the amount payable to Esden at normal retirement age and is the minimum interest rate credit payable under the Plan.[3] Instead, the Retirement Plan used an interest rate of 4% to project forward the current balance in Esden's Cash Balance Account, a computation which resulted in a lump sum benefit of $4,718.20 (or a life annuity of $45.22) payable at age 65. The present value of this projected forward benefit was (as had invariably been the case) less than the current balance

---

3. Esden suggests that a higher interest would be appropriate, e.g., the 8% interest rate in effect at the time of her termination, but reserves that question for the Court to decide at trial.

in Esden's Cash Balance Account. Paper 48 (Ritter Affidavit), ¶¶ 12–13; Paper 40 (Bernier Affidavit), ¶¶ 7–8.

At first impression, this logic appears simple and compelling; by using a 4% rate to arrive at an annuity equivalent of her normal retirement annuity, the Retirement Plan "fixed" the outcome of the computation so that the result would always be less than the value of the Cash Balance Account. The Retirement Plan would therefore be systematically underpaying vested participants who elected to take a lump sum distribution. However, to require the Plan to use an interest rate of 5.5% (or the interest rate applicable at the time of distribution) would defeat the objectives of a Cash Balance Plan. The Plan was introduced to allow Plan participants to know the dollar value of their accrued benefits at any given point in time before retirement and to allow younger employees an opportunity to accrue more benefits earlier in their careers. Paper 32, Exhibit 6.

As explained by the Internal Revenue Service in Notice 96–8, "most cash balance plans are designed to permit a distribution of an employee's entire accrued benefit, after termination of employment, in the form of a single sum equal to the employee's hypothetical account balance as of the date of the distribution." Since the defined benefit plan rules under the Internal Revenue Code were drafted to address traditional annuity plans, a cash balance plan must incorporate a formula that ensures that a pre-retirement lump sum distribution in an amount equal to the cash balance account will always equal or exceed the present value of the participant's normal retirement benefit. Paper 60 (Sher Affidavit). These provisions "mimic the benefit and accrual structure" of a more traditional annuity plan. IRS Notice 96–8.

Using a 4% rate to project future interest credits ensures that the Cash Balance Account does what it promises to do: the current balance at any point in time is equivalent to the present value of the Plan participant's retirement benefit. Since 4% is always less than the applicable PBGC discounting rate, participants who receive the cash balance in their accounts will always receive an amount that is equal to or greater than the present value of their normal retirement benefit.

In fact, as the IRS has observed, if an interest rate greater than the applicable PBGC discounting rate is used to project future interest credits, the interim calculation will invariably produce an actuarial annuity equivalent in excess of the balance in the cash balance account. IRS Notice 96–8. Such an actuarial annuity equivalent could not be said to approximate the participant's normal retirement benefits, at least in the context of a cash balance plan that provides for future interest credits to be tied to a variable index. The participant would receive a windfall, and the account balance could no longer be said to reflect an accurate projection of plan benefits as they accrue. Cf. Carollo v. Cement and Concrete Workers District Council Pension Plan, 964 F.Supp. 677, 683 (E.D.N.Y.1997) (holding that a defined benefit plan's accrual formula failed to satisfy ERISA's minimum accrual rates) ("The Plan makes it impossible to determine what a participant's retirement benefit will be and how much of it has accrued.").

While it may be unfortunate that the sponsors and administrators of cash balance plans must still engage in actuarial acrobatics to ensure compliance with applicable Treasury Regulations,[4] it is clear from the expert testimony of both parties that Esden's cash balance was at least equal to (and probably somewhat greater than) the present value of

---

4. Among those regulations is the so-called 133 1/3 Rule which prevents a defined benefit plan from "backloading" pension benefits so that employees who have longer tenures receive pension benefits calculated on a higher base than those who have fewer years of service. Esden contends that the Retirement Plan violates the 133 1/3% Rule, although the Amended Complaint contains no such allegation. Cf. Amended Complaint and Paper 72, at 12. The Court finds the

Retirement Plan to be, if anything, a "frontloaded" Plan which allows employees to accrue more benefits during their earlier years of service. Cf. Esden's lump sum benefit of $1547.73 for less than two years of service under the Cash Balance Account Plan with Esden's lump sum benefit of $3771.93 for more than 16 years of service under Bank of Vermont's traditional annuity plan. Paper 39, n. 11.

her normal retirement benefit under the Plan. If future interest credits had been projected at a 5.5% rate, instead of a 4% rate, the result would have been *less* than the balance in Esden's cash balance account. *See* Supplemental Bernier Affidavit (Paper 59), ¶ 16 (finding that the amount of Esden's lump sum distribution using a 5.5% projection rate would have been $1528.02, $19.71 less than the amount of Esden's actual distribution using the 4% projection rate). *See also* Ritter deposition (Paper 78, Exhibit 1) during which Esden's own expert acknowledged his unfamiliarity with cash balance plans (at 14, 17–18) and conceded that by his recalculations, the present value of Esden's normal retirement benefit exceeded her cash account balance by $61.54, a difference attributable to the date he used for selecting the applicable PBGC discounting rate—not the interest rate used to project future interest credits (at 74, 77–78).

We find it significant, but not outcome-determinative, that the Internal Revenue Service ("IRS") did not object to the Plan's interim calculations on two occasions: (1) shortly after the Plan was introduced (and before Esden was terminated) (Paper 41, Exhibits 5 and 6); and (2) after restatement of the Plan to conform to the Tax Reform Act of 1994 (Paper 41, Exhibit 7). Esden contends that the Retirement Plan concealed from the IRS its use of a 4% rate to project future interest credits in calculating pre-retirement distributions. The documents speak for themselves, and this was not the case. In 1990, in connection with obtaining the first IRS determination, the IRS examiner requested supplemental documentation from the Plan and that supplemental documentation contained the Plan's formula for projecting future interest credits. Paper 41, Exhibit 6B, "Demonstration of Compliance with 411(b)(1)(C)."

■ The Internal Revenue Code provides that determination letters "may not be used or cited as precedent." IRC, § 6110(j)(3). However, in this Circuit, an IRS determination is entitled to deference. *Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1411 (2d Cir.1985). While the determination of an IRS examiner should not dictate the outcome of a particular case (*Carollo v. Cement and Concrete Workers District Council Pension Plan,* 964 F.Supp. at 685), the Court finds that a determination is entitled to at least the weight accorded other expert testimony. This is particularly true of the determination letter that the Retirement Plan received before Esden was terminated. Paper 41, Exhibits 5 and 6. That determination letter was based on the Plan's provisions as in effect at the time of her termination, documentation indicates that the IRS examiner took into account the Plan's interim calculation formula in making the determination, and Plan employees were given an opportunity to comment on the Plan while the determination was pending. Paper 41, Exhibits 5, 6 and 9. *Cf. Carollo v. Cement and Concrete Workers District Council Pension Plan,* 964 F.Supp. at 685 ("Plan participants ha[d] no opportunity to be heard in a pending application for a favorable determination letter from the Service.").

**VI. Whether the Retirement Plan caused Esden to forfeit a portion of her accrued benefits.**

■ Esden alleges that the Plan's conduct resulted in an impermissible forfeiture of benefits under Treasury Regulation 1.411(a) in that the right to receive the 5.5%–10% interest credit was conditioned on Ms. Esden not taking a distribution prior to normal retirement age. Amended Complaint, ¶ 38.

Treasury Regulation 1.411(a) provides that an employee benefit plan may not be considered a qualified plan (*i.e.,* entitled to tax-deferred treatment of distributions) unless the plan provides that an employee's right to his or her normal retirement benefit is "non-forfeitable" upon and after normal retirement age. § 1.411(a)–1(a)(4). With certain exceptions not applicable here, a right to an accrued benefit that is conditioned upon a subsequent event, subsequent performance or subsequent forbearance is a forfeitable right. § 1.411(a)–4(a). Certain adjustments to plan benefits, such as adjustments in excess of reasonable actuarial reductions, can also result in rights being forfeitable. *Id.*

Esden contends that the Retirement Plan causes participants opting for pre-retirement

distributions to forfeit their accrued benefits to the extent that the Plan uses a 4% interest rate to project future interest credits, rather than an interest rate in the 5.5%–10% range. According to Esden, a Plan participant's accrued benefits are forfeitable if the participant must wait until normal retirement age to receive a distribution based on interest credits in the 5.5–10% range.

However, § 1.411(a)–11(d) states that in determining the present value of any distribution of accrued benefits from a defined benefit plan, the plan must comply with the valuation rules set forth in § 1 .417(e)–1(d). As the Court finds the Retirement Plan in compliance with the valuation rules set forth in that Section (see discussion supra), the Court finds as a corollary that the Plan is in compliance with the anti-forfeiture rules set forth in § 1.411(a).

VII. Whether this case should be certified as a class action.

■ On August 31, 1998, the Court conducted a limited evidentiary hearing with respect to Esden's suitability as class representative and heard oral argument on class certification. At that time, the Court ordered the class conditionally certified under Rule 23(b)(1) [5] and (b)(2),[6] pending consideration of the merits in the context of deciding the pending motions for summary judgment.

The class conditionally certified on August 31, 1998 is comprised of the following individuals:

"All persons in the Retirement Plan of the First National Bank of Boston who received a lump sum distribution of his or her cash balance account between January 1, 1989, and the present which was less than the present value of his or her normal retirement benefit." Amended Complaint, ¶ 21.

In initially opposing class certification, the Retirement Plan contended that Esden was neither able nor willing to serve as class representative.[7] In her deposition, Esden appeared to be startlingly unfamiliar with the facts of this case and with the attorneys who represent her. Even more disturbing, she indicated that she expected to receive a windfall (about $10,000) if she prevails. See Paper 32, Exhibit 1.

■ After further examination of Esden during the limited evidentiary hearing, the Court concluded that she had a sufficient grasp of the case and a sufficient commitment to the proceeding to continue as named representative. The named representative need not have a command of all the facts underlying the cause of action. Langner v.. Brown, 1996 WL 709757 *7 (S.D.N.Y.1996). Nor does the named representative need have a grasp of the intricacies of the legal theory of recovery. Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 201 (S.D.N.Y. 1992). It is sufficient if he or she can demonstrate a basic understanding of why the case has been brought. Dura–Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 102 (S.D.N.Y.1981).

In its supplemental opposition to class certification, however, the Retirement Plan also challenged Esden's ability to serve as an adequate representative of the defined class because her interests are in conflict with absent class members. See Paper 78. This objection to class certification emerged after Esden's expert acknowledged that she could only base a claim for additional benefits on a

5. An action may be maintained as a class action where "the prosecution of separate actions by ... individual members of the class would create a risk of ... inconsistent or varying adjudications with respect to individual members ... which would establish incompatible standards of conduct for the party opposing the class ..." F.R.Civ.P. 23(b)(1)(A).

6. An action may be maintained as a class action where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief

with respect to the class as a whole." Fed. R.Civ.P. 23(b)(2).

7. Rule 23(a)(4) requires a movant for class certification to prove that the "class representative/s will fairly and adequately protect the interests of the class." A case may be certified for class action only if the movant has proved that the four pre-requisites of Rule 23(a)—numerosity, commonality, typicality and adequacy—are satisfied. The Retirement Plan's opposition to class certification has focused on whether Esden could serve as an adequate class representative.

theory that the wrong PBGC rate had been used in computing the present value of her normal retirement benefit. Paper 78, Exhibit 1, at 74, 77–78.

Since this aspect of the Retirement Plan's opposition to class certification focuses primarily on the merits, the Court deferred consideration of the Retirement Plan's arguments until disposition of the pending motions for summary judgment. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (A court should not consider the merits in deciding whether a case should be maintained as a class action.). No doubt the Retirement Plan would withdraw this objection, given the Court's decision to grant the Plan's motion for summary judgment.

The Court reiterates, however, that Esden's theory of recovery is not based on the use of the wrong PBGC rate in discounting normal retirement benefits, but rather on the use of the wrong interest rate in projecting future interest credits to arrive at the actuarial equivalent of those benefits. Amended Complaint, ¶¶ 37–38. Counsel for Esden affirmed that theory of recovery at the outset of oral argument on class certification. A ruling in favor of the Retirement Plan does not cause Esden to become an inadequate class representative. It simply means that Esden and the other members of the defined class are bound by that ruling, and subsequent adjudications on the same issue may now be avoided. *See* Rule 23(b)(1).

The Court therefore removes the conditions to class certification previously imposed. In view of its ruling on the merits, the class is certified only under Rule 23(b)(1). In granting the Retirement Plan's motion for summary judgment, the Court finds that Esden (and other class members) are not entitled to additional benefits *or equitable relief* on the rationale set forth in the Amended Complaint.[8]

## VIII. Conclusion.

Defendant Retirement Plan's Motion for Summary Judgment (Paper 38) is GRANTED. Esden's Cross Motion for Summary Judgment (Paper 46) is DENIED. The conditions attached to class certification are removed and this case is unconditionally certified as a class action under Rule 23(b)(1). CASE CLOSED.