**Lynn ESDEN, Individually and on Behalf of All Others Similarly Situated, Plaintiff–Appellant,**

v.

**BANK OF BOSTON, and Certain Affiliated Companies, Retirement Plan of the First National Bank of Boston, and Certain Affiliated Companies, Defendants–Appellees.**

Docket No. 99–7210.

United States Court of Appeals, Second Circuit.

Argued: Nov. 29, 1999

Decided: Sept. 12, 2000

Douglas R. Sprong, Belleville, Ill. (Steven A. Katz, Carr, Korein, Tillery, Kunin, Montroy, Cates & Glass, Jerome O'Neill,

O'Neill, Crawford & Green, on the brief) for Plaintiff–Appellant.

George Marshall Moriarty, Boston, Mass. (Crystal D. Talley, Ropes & Gray, on the brief) for Defendants–Appellees.

Before: NEWMAN, LEVAL and POOLER, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiff Lynn Esden, individually and as class representative,[1] appeals from the Order and Judgment of the United States District Court for the District of Vermont (William K. Sessions, III, *Judge* ), entered on September 29, 1998, granting summary judgment in favor of defendant, The Retirement Plan of The First National Bank of Boston (the "Plan"), *see Esden v. Retirement Plan of the First Nat'l Bank of Boston,* 182 F.R.D. 432 (D.Vt.1998 ) *("Esden I ")*, and from the unpublished Supplemental Opinion and Order, entered on February 10, 1999, denying her motion to alter or amend the judgment, see *Esden v. Retirement Plan of First Nat'l Bank of Boston,* No. 2:97–CV–114 (D.Vt. Feb. 10, 1999) (*"Esden II ")*.

■ This case concerns the application of parallel statutory provisions of the Internal Revenue Code ("I.R.C." or the "Code"), 26 U.S.C. 401 *et seq.,* and the Employee Retirement Income Support Act of 1974 ("ERISA"), 29 U.S.C. 1001 et *seq.,*[2] and the regulations promulgated thereunder, to a cash balance plan—a relatively new, and increasingly controversial, species of defined benefit plan. In particular, as an issue of first impression in the Courts of Appeals,[3] we must decide whether when a cash balance plan guarantees that interest will be credited to a participant's hypothetical account at a minimum rate, it violates ERISA to assume a lower rate when projecting that account's value out to normal retirement age for the purposes of calculating the lump-sum equivalent of a terminating vested participant's accrued benefit. We hold that it does. We conclude that the Plaintiff received less than the actuarial equivalent of her accrued benefit, in violation of ERISA § 203(e)(3); I.R.C. § 411(a)(11) and Treas. Reg. § 1.417(e)–1. Further, we conclude that because Plaintiff received less than she would have had she not elected to take her benefit in the form of a lump sum, part of her pension benefit was made condition-

1. Esden represents a class comprising: "All persons in the Retirement Plan of the First National Bank of Boston who received a lump sum distribution of his or her cash balance account between January 1, 1989, and the present which was less than the present value of his or her normal retirement benefit." *Esden I,* 182 F.R.D. at 440.

2. Much of Title I of ERISA, codified at Title 29 U.S.C., was duplicated in Title II, which was codified as amendments to the I.R.C. Therefore, many of ERISA's provisions on vesting, accrual and funding—including those relevant to this case—appear twice in the United States Code. As to which agency has rule-making authority, ERISA continues to be administered by three agencies: Labor, Treasury and the Pension Benefit Guaranty Corporation. Under Reorganization Plan No. 4 of 1978, § 101, 43 Fed.Reg. 47713, 47713, the IRS was given primary jurisdiction and rule-making authority over ERISA's funding, participation, benefit accrual and vesting provisions. ERISA § 3002(c) specifically adopts

the regulations promulgated under I.R.C. §§ 410(a), 411 and 412. Regulations promulgated under ERISA further explain the relationship between ERISA and the I.R.C. See 29 C.F.R. § 2530.200a–2 ("[R]egulations prescribed by the Secretary of the Treasury [under I.R.C. §§ 410 and 411] shall also be used to implement the related provisions contained in [ERISA].").

3. Only one other district court has yet dealt with this issue. *See Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan,* 66 F.Supp.2d 1328 (N.D.Ga.1999). *Lyons* resolved the tension between the design objectives of cash balance plans and the applicable treasury regulations by taking the extraordinary step of holding the regulations prescribing the section 417(e) applicable rate "unreasonable" under a *Chevron* analysis. *See id.* at 1334–36. As this opinion was being readied for publication, the Eleventh Circuit reversed, holding the regulations valid. *See Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan,* 221 F.3d 1235 (11th Cir.2000).

al on the distribution option chosen, in violation of the anti-forfeiture provisions of ERISA § 203(a); I.R.C. § 411(a)(2) and Treas. Reg. § 1.411(a)–4.

We therefore REVERSE the judgment of the district court and REMAND for further proceedings.

## BACKGROUND

### A. Cash Balance Plans and the issue of "Whipsaw."

Under a cash balance pension plan, a hypothetical account is established in each participant's name. Benefits are credited to that "account" over time, driven by two variables: (1) the employer's hypothetical "contributions," and (2) hypothetical earnings expressed as interest credits. Employer "contributions" are usually expressed as a percentage of salary, the rate of which may vary with employee tenure. Interest credits may be at a fixed interest rate, but more often they are tied to an extrinsic index—for example, U.S. Government securities of a specified maturity—and they vary accordingly. Each year an employee receives a statement of her "account" balance, and can therefore see the value of her pension benefit. These features are designed to mimic the simplicity of a defined contribution plan.[4, 5]

■ However, notwithstanding that cash balance plans are designed to imitate some features of defined contribution plans, they are nonetheless defined benefit plans under ERISA.[6] The regulatory consequences of this classification are wide-reaching. First, ERISA § 3(23) provides different definitions of "accrued benefit" for defined benefit and defined contribution plans. Only for a defined contribution plan is "accrued benefit" defined as simply "the balance of the individual's account." ERISA § 3(23)(B); I.R.C. § 411(a)(7)(A). Second, defined benefit plans are subject to a series of parallel statutory con-

**4.** A conventional defined benefit plan, adopting a final-pay formula would credit the employee with a specific percentage of salary for each year of employment. For instance, an employee might accrue a pension of 1.5% of "salary" for every year of service. After 30 years of service he would have a pension equivalent to 45% of "salary." Salary may be defined as final salary, or the average of salary in the last five years. *See generally* John H. Langbein & Bruce A. Wolk *Pension and Employee Benefit Law* 45 (3d ed.2000).

**5.** Advocates of cash balance plans maintain that these plans provide employees with significant advantages over traditional defined benefit plans, including that: (1) they are easier to understand; (2) they allow greater portability; (3) their benefits accrue more evenly over an employee's life-cycle; and (4) they are, therefore, better suited to the increased job-mobility of contemporary labor markets. The benefits for employers are commonly held to be: (1) because employees better appreciate the value of their pension rights, the employer's fringe benefit dollar has greater impact; and (2) the employer retains the funding advantages of a defined benefit plan, namely (a) actual contributions are made to a single trust fund, based on actuarial assumptions; therefore (b) the employer retains funding flexibility as long as the solvency of the plan is maintained; and (c) the investment experience in excess of the promised interest credits (as well as forfeitures of the non-vested benefits of any terminated participants) belongs to the employer. In short, advocates of this "hybrid" claim it offers employers—if not all employees—the best of both the defined benefit and the defined contribution pension formats. *See generally* Carol Quick, *Overview of Cash Balance Plans*, EBRI Notes 1 (July 1999).

**6.** Under ERISA the terms "defined contribution plan" and "individual account plan" are synonymous and are both defined as "a pension plan which provides for an individual account for each participant and for *benefits based solely upon the amount contributed* to the participant's account, and any income, expenses, gains and losses...." ERISA § 3(34) (emphasis added). A "defined benefit plan" is defined as any plan "other than an individual account plan." ERISA § 3(35). However "hybrid" in design a cash balance plan may be, it remains subject to a regulatory framework that is in many regards rigidly binary. Because the individual accounts, and the employer contributions and the interest credits to those accounts, are all hypothetical under a cash balance plan, it is classified as a defined benefit plan. The Plan does not (and cannot) dispute this definition. Rather it resists—and has tried to draft around—its consequences.

straints—under ERISA and I.R.C.—from which defined contribution plans are exempted. Those relevant to this case include: limitations on "backloading" of accruals, *see* ERISA § 204(b)(1); I.R.C. § 411(b)(1); the valuation rules of I.R.C. § 417(e) as made applicable by I.R.C. § 411(a)(11)(B), *see also* ERISA §§ 203(e), 205(g); and the definitely determinable benefits requirement of I.R.C. § 401(a)(25).

It is undisputed that the governing statutes and regulations were developed with traditional final-pay defined benefit plans in mind; they do not always fit in a clear fashion with cash balance plans and they sometimes require outcomes that are in tension with the objectives of those plans. In the argot of pension law practitioners, this case involves the phenomenon of "whipsaw."[7] In brief, the rules governing distributions from defined benefit plans are framed in terms of the normal retirement benefit—typically, a single-life annuity payable at normal retirement age. Any distribution in optional form (such as a lump sum) must be no less than the actuarial equivalent of such benefit. For a cash balance plan this calculation involves projecting the cash balance forward and then discounting back to present value. The projection rates may be defined by the plan; but the discount rate is prescribed by statute. If the plan's projection rate exceeds the statutory discount rate, then the present value of the accrued benefit will exceed the participant's account balance. Unless this higher figure is paid out, the IRS takes the view that an impermissible forfeiture has occurred in viola-

tion of ERISA § 203(a) and I.R.C. § 411(a)(2). *See* Notice 96–8, 1996–1 C.B. 359–61. We agree.

The IRS's consistent interpretation of the statutes and its own regulations is reasonable and is entitled to deference. We therefore conclude that the district court erred in giving effect to the terms of the plan rather than enforcing the statutory and regulatory scheme as authoritatively interpreted by the IRS.

## B. The Facts.

### 1. Esden's employment.

The material facts are not disputed. Esden was employed by Bank of Vermont (and its predecessor) from 1974 to December 7, 1990. During this time the Bank of Vermont became an indirect subsidiary of Bank of Boston, the Plan's sponsor. Throughout this time Esden was a participant in the Plan. The Plan was at all times a defined benefit plan subject to ERISA. Before 1989, the plan was a traditional defined benefit plan, employing a final-pay formula. Effective January 1, 1989, the Plan was amended to become a cash balance plan.[8] After its amendment the Plan was twice reviewed by the IRS, in 1990 and again in 1995. On each occasion the IRS issued a determination letter stating that the Plan was a "qualified plan" pursuant to I.R.C. § 401(a) *et seq.*[9]

On the termination of her employment, the pension benefits Esden had accrued were 100% vested. *See* ERISA § 203(a)(2); I.R.C. § 411(a)(2). As the Plan allowed, she elected to receive those benefits as an immediate lump-sum pay-

---

7. The phenomenon is widely recognized in the practice literature. *See, e.g.,* Lee A Sheppard *The Down–Aging of Pension Plans*, 1999 Tax Notes Today 6–6 (Jan. 11, 1999).

8. The pension plan of the Bank of Vermont was merged into the Plan effective October 1, 1989, after the Plan had converted to a cash balance plan. *See Second Amendment to the Retirement Plan of The First National Bank of Boston and Certain Affiliated Companies* pt. II, § 1 [hereinafter *Restated Plan* ].

9. Qualified pension plans enjoy significant tax advantages. First, employees pay no tax on their employers' contributions to the pension trust; tax is deferred until actual distribution of benefits. *See* I.R.C. § 402(a). Second, employers receive a current income tax deduction for contributions to the trust. *See* I.R.C. § 401(a)(1)-(3). Third, the trust itself is exempted from tax on its investment income. *See* I.R.C. § 501.

ment. In March 1991, she received a check for $5,319.66. Of this amount, $3,771.93 was paid as the actuarial equivalent of the annuity she would have been entitled to receive commencing at age 65 under the terms of the unamended plan ("Prior Plan Benefit"). This amount is not disputed and forms no part of this appeal.

The remaining $1,547.73 represented the balance of her Cash Balance Account and was paid out as the lump-sum equivalent of all accrued benefits to which she was entitled under the cash balance plan ("Cash Balance Benefit"). This dispute arises over whether the Plan's methodology for calculating this amount was permissible under the parallel statutory provisions of ERISA and the Code and the regulations promulgated thereunder. We hold that it was not.

### 2. The Plan

The Plan is a cash balance plan. The following provisions of the Plan are relevant to this appeal. Under section 3.1, a hypothetical Cash Balance Account is established for each participant. Section 3.2 provides for employer contributions (termed "Annual Cash Balance Credits") to each active participant's Cash Balance Account, expressed as a percentage of the employee's compensation. This Credit varies from 3.25% of salary in an employee's second year of employment through a maximum Credit of 11.0% of salary for employees in their 20th through their 34th year of employment. Under sections 3.3 and 12.29 interest is also credited to the participant's Cash Balance Account annually, at a rate equal to the average of the three-month Treasury Bill rates in effect on the first day of each month *plus* 0.5% (the "Interest Credit"). However, the rate of the Interest Credit is never to exceed 10.0% nor to be less that 5.5%. Under section 6.4, after five years of service, a

participant's accrued benefit becomes 100% vested; if the employee is terminated before that time, however, then all accrued benefits are forfeited. *Cf.* ERISA § 203(a)(2)(A) (providing for "5–year cliff" vesting); I.R.C. § 411(a)(2)(A) (same). Under section 10.6, amounts so forfeited are applied to reduce the employer' s required contributions to the Plan's trust fund.

The Annual Cash Balance Credits to the employee's hypothetical account cease on termination of employment. However, the annual Interest Credits continue to be credited to the account until distribution of benefits begins.

The Plan provides several payment options. At the time of Esden's termination, because the total value of her Retirement Plan Benefit (defined as the sum of her Cash Balance Benefit and her Prior Plan Benefit) exceeded $3,500, and because she was married, the Plan provided that her benefit would be paid automatically as a 50% Joint and Survivor Annuity beginning at age 65, unless she elected another option. Her other relevant options included taking an actuarially reduced annuity at any time after age 55 or taking a lump-sum distribution at any time before age 65. She elected to take the lump-sum distribution.

### 3. The lump-sum calculations.

At the time of her termination, Esden had $1,533.98 in her cash balance account. It is undisputed that, had Esden not elected to take her benefit in the form of a lump sum, the minimum amount of her accrued benefit, expressed as a lump sum at normal retirement age of 65, would have been $7,086.83. This figure is calculated by projecting the Cash Account Balance from Esden's termination date through age 65, assuming annual Interest Credits of 5.5%.[10] The defendant rightly character-

---

10. The Plan itself communicated this estimate to Mrs. Esden when it advised her of the value of her pension benefits on termination. *See* Letter from Bank of Boston to Esden of

2/15/91. It is also the calculation required by Bank of Boston's own internal manual setting out the benefit calculation methodology for "Terminated Vesteds."

izes this as an "estimate." Insofar as actual Interest Credits would fluctuate with the average 3–month Treasury Bill rate to which they are indexed, then Esden's actual accrued benefit at age 65 would differ. But this amount is also a minimum: under no circumstances, pursuant to the terms of the Plan, could Esden's accrued benefit at age 65 be less than $7,086.83 because the annual Interest Credit was guaranteed to be at least 5.5%. In the same manner, the maximum amount of her accrued benefit can be calculated by projecting Esden's cash balance account through age 65, assuming annual Interest Credits of 10.0%, the maximum rate allowed by the plan. This calculation yields a balance of $23,-386.18. There is no dispute that, had Esden not elected a lump-sum distribution on termination, then her accrued benefit, expressed as a lump sum payable at normal retirement age, would have fallen within the range $7,086.83–$23,386.18. No other amount was possible under the terms of the Plan. Discounted to present value, as of the date of Esden's termination, according to the methodology required by I.R.C. § 417(e)(3), ERISA § 205(g)(3), and Treas. Reg. § 1.417(e)–1(d), as made applicable by I.R.C. § 411(a)(11), ERISA § 203(e)(2) and Treas. Reg. § 1.411(a)–11(d), this minimum accrued benefit had a present value of $1,595.52. This amount exceeds the $1,533.98 that Esden received as her lump sum distribution by $61.54. This is the crux of the plaintiff's claim: Esden contends she forfeited at least $61.54 of benefits because of the payment option she chose. Class members have similar claims.

The Plan is drafted so that whenever a participant elects a lump-sum distribution, the benefit received will always be her Current Cash Balance Account. In sum, the Plan employs language that attempts to comply with the traditional annuity-based framework of the Treasury regulations, while guaranteeing that the lump-sum distribution would always be the Current Cash Balance Account. To achieve this result, section 4.1 of the Plan provides

that at any time a participant's "Accrued Amount" is her "Current Cash Balance Annuity." Under section 4.2, the "Current Cash Balance Annuity" is calculated by (1) projecting the Current Cash Balance Account to age 65 at a rate of 4% compounded annually, and then (2) converting this amount into a single-life annuity payable monthly by applying an annuity factor not in dispute. In short, the Plan is drafted to ensure that a participant's Normal Retirement Benefit (defined as her Accrued Amount determined as of Normal Retirement Age of 65) is always projected at a rate of 4%, notwithstanding that actual Interest Credits, while variable, cannot accrue at a rate lower than the guaranteed minimum rate of 5.5%.

In the case of an election to take a lump-sum distribution, under section 7.4(d) of the Plan, the amount paid out is the greater of the actuarial equivalent of the Current Cash Balance Annuity or the Current Cash Account Balance. The mortality and interest rate assumptions to be used in determining actuarial equivalence are set out in Exhibit A of the Plan. As required by I.R.C. § 411(a)(11)(B) and ERISA § 203(e)(2) at the time of Esden's distribution, the Plan provides that the interest rate assumption was the "PBGC interest rate structure for deferred annuities." Because this structured interest rate has always exceeded the 4% projection rate, the Plan guarantees that "whipsaw" will never occur: the discount rate (provided by statute) always exceeds the projection rate (provided by the Plan). Therefore, the actuarial equivalent of the Current Cash Balance Annuity will never exceed the Current Cash Account Balance. As a consequence, the Plan will always pay out the Current Cash Account Balance. The key issue raised by this case is whether that 4% projection rate is proper.

## C. *Proceedings Below*

Having exhausted her administrative remedies under the Plan, Esden brought

this class action pursuant to ERISA § 502(a)(1)(B) and (a)(3), seeking, *inter alia:* (1) certification of the plaintiff class; (2) money damages in the amount of unpaid benefits due under the terms of the Plan to all members of the class; and (3) a permanent injunction barring the Plan from calculating future lump sum distributions in violation of ERISA.[11] Relying on the design objective of cash balance plans in general, the express terms of this particular Plan and the fact that the IRS had issued two favorable determination letters, the district court found that the 4% projection rate was permissible when calculating the lump-sum present value of Esden's accrued benefit. *See Esden I,* 182 F.R.D. at 437–439. As a corollary, it concluded that there was no forfeiture when Esden received only the value of her Current Cash Account Balance. *See id.* at 439–40. It therefore entered summary judgment in favor of the Plan. In a supplemental opinion, denying the plaintiff's Rule 59(e) motion to alter or amend, the district court confirmed that it based its conclusion on a finding that the 4% projection rate was proper. *See Esden II,* No. 2: 97–cv–114, at 2–3. Esden filed a timely appeal.

### DISCUSSION

Plaintiff contends that when she was paid only the balance of her cash balance account, she received less than the law requires. The Plan responds that when plaintiff received her cash account balance, she received all that she was promised under the express terms of the Plan. It argues that she had the benefit of her bargain and now opportunistically seeks a "windfall" at the expense of other Plan participants. Further, the Plan argues for the first time on appeal that the regulations under I.R.C. sections 411 and 417 are unreasonable in that they go beyond the plain meaning of the statutes. Lastly, the Plan argues that it is entitled to rely on

the favorable determination letters issued by the IRS in 1990 and 1995.

We agree with Plaintiff. The Plan does not comply with the statutory and regulatory requirements, or with their authoritative interpretation issued by the IRS. We conclude, furthermore, that the IRS's interpretation of how the existing regulations apply to cash balance plans is reasonable and consistent.

A. · *The manner in which the plan calculated the value of Esden's lump-sum distribution did not comply with the statutory and regulatory requirements.*

1. *Lump-sum distributions of accrued benefits must be the actuarial equivalent of the normal retirement benefit calculated according to a methodology prescribed by the regulations.*

ERISA § 3(22) defines "normal retirement benefit" as "the greater of the early retirement benefit under the plan, or the benefit under the plan commencing at normal retirement age." *See also* I.R.C. § 411(a)(9) (parallel definition); Treas. Reg. § 1.411(a)–7(c); Treas. Reg. § 1.411(a)–1(a)(7) (providing that definitions and rules in Treas. Reg. 1.411(a)–7, promulgated under Code section 411(a)(7), (8), and (9), apply for purposes of section 411 and the regulations thereunder). "Normal retirement age" is defined as 65, unless otherwise provided by the pension plan. *See* ERISA § 3(24); I.R.C. § 411(a)(8); Treas. Reg. § 1.411(a)–7(b). It is uncontested that in this case the Plan provided that Esden's normal retirement age was 65.

The Plan is a defined benefit plan, *see* ERISA § 3(35), not a defined contribution plan, *see id.* § 3(34). For a defined contribution plan, the term "accrued benefit" means simply "the balance of the individual's account." ERISA § 3(23)(B); I.R.C.

---

11. The Complaint also included a prayer for reasonable attorney's fees pursuant to ERISA

§ 502(g).

§ 411(a)(7)(A)(ii); *see also* Treas. Reg. § 1.411(a)–7(a)(2). In contrast, in the case of a defined benefit plan, the term accrued benefit means "the individual's accrued benefit determined under the plan and, except as provided in section 204(c)(3) [I.R.C. § 411(c)(3) ], *expressed in the form of an annual benefit commencing at normal retirement age.*" ERISA § 3(23)(A) (emphasis added); I.R.C. § 411(a)(7)(A)(i); *see also* Treas. Reg. § 1.411(a)–7(a)(1). In turn, ERISA § 204(c)(3) provides that "in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age [*e.g.,* a lump-sum distribution at termination] ... the employee's accrued benefit ... shall be the actuarial equivalent of such benefit ..." *See also* I.R.C. § 411(c)(3). The regulations confirm this general rule. *See* Treas. Reg. § 1.411(c)–1(e).

What these provisions mean in less technical language is that: (1) the accrued benefit under a defined benefit plan must be valued in terms of the annuity that it will yield at normal retirement age; and (2) if the benefit is paid at any other time (*e.g.,* on termination rather than retirement) or in any other form (*e.g.,* a lump sum distribution, instead of annuity) it must be worth at least as much as that annuity.

This rule that regardless of any option as to timing or form of distribution, a vested participant in a defined benefit plan must receive a benefit that is the actuarial equivalent of her normal retirement benefit (that is, the accrued benefit expressed as an annuity beginning at normal retirement age) has been repeatedly recognized by courts. *See, e.g., McDaniel v. The Chevron Corporation,* 203 F.3d 1099, 1120 (9th Cir.2000) (stating that ERISA requires that lump-sum benefit must be actuarial equivalent of amount or benefit that would commence at normal retirement age); *Spacek v. Maritime Assoc., I L A Pension Plan,* 134 F.3d 283, 290 (5th Cir.1998) (recognizing "general rule that, where an employee's pension benefit commences at a time other than normal retirement age, the accrued portion of such a benefit is the actuarial equivalent of the retirement benefit available at normal retirement age"); *Costantino v. TRW, Inc.,* 773 F.Supp. 34, 41 (N.D.Ohio 1991) (" '[A]ccrued benefit' can best be defined as the actuarial equivalent of the annual benefit commencing at normal retirement age"), *aff'd in part,* 13 F.3d 969 (6th Cir.1994); *cf. Myers–Garrison v. Johnson & Johnson,* 210 F.3d 425, 430 (5th Cir.2000) ("[The I.R.C. § 411(c)(3) ] definition suggests that the annual benefit [commencing at normal retirement age] is a yardstick for measuring the benefit.").

Nor, before this appeal, has the defendant Plan disputed either the requirements of this regulatory framework, or that those requirements apply to it because it is a defined benefit plan. In a letter denying Esden's administrative request for additional benefits, the Plan's manager conceded, "You are correct in your assertion that a lump sum payable under a cash balance plan can be no less than the present value of the normal retirement benefit." In his sworn affidavit, the Plan's own expert affirmed that "[d]efined benefit plans that offer lump sums are required to provide a lump sum amount that is not less than the present value of an annuity at normal retirement utilizing interest rates specified by law." Bernier Aff. ¶ 6. Lastly, the structure of the Plan itself, which as we have seen defines Accrued Amount as the Current Cash Balance Annuity, calculated as of normal retirement age, is drafted to comply with these regulatory requirements.[12]

---

**12.** On appeal, the Plan argues for the first time that ERISA does not "dictate a relationship between the amount payable as a lump sum and a participant's 'normal retirement benefit.' " Appellee Br. at 26. The argument is sophistical; it relies largely on the fact that ERISA § 204(c)(3) does not use the term "normal retirement benefit." But since

■ Because the Plan is a defined benefit plan, any distribution from the plan must be the actuarial equivalent of the accrued benefit expressed as an annual benefit payable at normal retirement age, that is—otherwise expressed—the normal retirement benefit.

■ For the purposes of this rule, the regulations do not leave a plan free to choose its own methodology for determining the actuarial equivalent of the accrued benefit expressed as an annuity payable at normal retirement age. If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of "actuarial equivalence." *See, e.g.,* H.R.Rep. No. 103–632, pt. 2, at 57 (1994) ("If plans could use high [discount] rates, plans could lower the single sum paid to participants."). To comply with ERISA, as well as to be considered a qualified plan under the Code, a plan must comply with specified valuation rules and certain consent rules. *See* Treas. Reg. § 1.411(a)–11(a)(1); *see also* Treas. Reg. § 1.417(e)–1(a). By regulation, these prescribed valuation rules apply to all distributions, regardless of value, regardless of type of defined benefit plan and regardless of any additional consent requirement:

> *Distribution valuation requirements.* In determining the present value of *any distribution of any accrued benefit from a defined benefit plan,* the plan must take into account specified valuation

rules. For this purpose, the valuation rules are the same valuation rules for valuing distributions as set forth in section 417(e); *see* § 1.417(e)–1(d).... This paragraph also applies *whether or not the participant's consent is required* under paragraphs (b) and (c) of this section.

Treas. Reg. § 1.411(a)–11(d) (emphases added).

The cross-referenced Code section 417(e) requires that the accrued benefit be discounted back to present value at the "applicable interest rate." I.R.C. § 417(e)(3)(A); ERISA § 205(g)(3); Treas. Reg. § 1.417(e)–1(d).[13] At the time Esden received her benefit in the form of a lump sum, the "applicable interest rate" (for amounts having a present value less than $25,000) was defined as the same discount rate that would "be used (as of the date of the distribution) by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump sum distribution on plan termination." I.R.C. §§ 417(e)(3)(B), 411(a)(11)(B)(ii) (both as in effect in 1991); ERISA §§ 205(g)(3)(B); 203(e)(2)(B) (both as in effect in 1991); *see also* Treas. Reg. § 1.417(e)–1(d)(2). In general, the regulations promulgated under section 417(e) further provide that: "A plan does not satisfy the requirements of sections 401(a)(11) and 417 unless it satisfies the ... determination of present value requirements ... set forth in this section."

the language of ERISA § 204(c)(3) incorporates exactly the language used in the definition of "normal retirement benefit"—"benefit commencing at normal retirement age"—and requires that any optional payment be the actuarial equivalent of this benefit, the Plan's argument is unpersuasive.

**13.** Both the statute and the regulation have been subsequently amended. In 1994, the statutory definition of the "applicable interest rate" was changed to the "annual rate of interest on 30–year Treasury securities for the month before the date of distribution or such other time as the Secretary may by regulations prescribe." Retirement Protection Act of 1994, Pub.L. No. 103–465, § 767(a), 108 Stat. 4809, 5038. Parallel amendments were

made to ERISA § 203(g)(3). *See* Pub.L. No. 103–465, § 767(c)(2). These amendments also added a statutory requirement that the Secretary prescribe an "applicable mortality table" for converting annuities into lump-sums. *See* I.R.C. § 417(e)(3)(A)(ii)(II); ERISA § 205(g)(3)(A)(ii)(II). At the same time I.R.C. § 411(a)(11)(B) and ERISA § 203(e)(2), which had previously duplicated the valuation provisions of I.R.C. § 417(e)(3) and ERISA 205(g) respectively were amended to provide that "present value shall be calculated in accordance with" those respective sections, thus removing redundancy from the U.S.Code. *See* Pub.L. No. 103–465, § 767(a)(1), (c)(1).

Treas. Reg. § 1.417(e)–1(a). These "present value requirements" require that any lump sum distribution be at least the present value of the normal retirement benefit:

> For purposes of determining the present value of any accrued benefit and for purposes of determining the amount . . . of *any distribution including a single sum,* a defined benefit plan is subject to the [Section 417 applicable interest rate]. . . . The *present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit* determined in accordance with this paragraph.

Treas. Reg. § 1.417(e)–1(d)(1) (as in effect in 1991) (emphases added).

The application of these lump-sum valuation rules to a conventional final-pay formula defined benefit plan is uncontroversial. *See, e.g., Costantino,* 13 F.3d at 972 (explaining discounting of stream of annuity payments to lump-sum equivalent). Because such plans define the benefit in annuity form as a function of the participant's final salary, they already express the benefit annuity at normal retirement age. The valuation rules under Treasury Regulations sections 1.411(a)–11(d) and 1.417(e)–1(d)(1) require this annuity to be discounted to a present value lump sum by applying the statutorily required discount rate and mortality tables.[14]

The issue presented by this case is how these regulations should be applied to cash balance plans, which express the employee's benefit in terms of a current hypothetical account balance (together with the accrued right to receive future interest credits) rather than as a function of the participant's final salary. On this issue we find that the IRS has provided consistent guidance, as we set out below.

**2. *The regulations applied to cash balance plans: the significance of Notice 96–8, 1996–1 C.B. 359***

Notice 96–8, 1996–1 C.B. 359, released on January 18, 1996, provides guidance on the applicability of Code sections 411(a) and 417(e) to lump-sum distributions from cash balance plans. The Notice confirms that in order to comply with sections 411(a) and 417(e), when calculating a lump-sum distribution, a cash balance plan must project the balance of the hypothetical account forward to normal retirement age and then pay out the present value of that projected balance, computed according to section 417(e). *See* 1996–1 C.B. at 359. This dispute arises over the projection rate used by the Plan in applying this framework.

If the plan's projection rate (that is the hypothetical interest credits it provides) and the statutorily prescribed discount rate are identical, then the present value of the hypothetical account projected forward to normal retirement age determined by this computation will be exactly the current cash account balance. It follows that a plan which provides for interest credits at the section 417(e) applicable rate may pay out the cash account balance as the actuarial equivalent of the accrued benefit. *See* 1996–1 C.B. at 361.

The Notice also directly confronts the problem of "whipsaw." It explains the twin violations that a plan must avoid in complying with statutory valuation requirements when the plan provides for interest credits that *exceed* the statutory discount rate. Under these conditions, payment of only the cash account balance will no longer constitute a complete distribution of the actuarial equivalent of the employee's accrued benefit. Necessarily, as a matter of mathematics, a distribution of only the account balance will involve one

---

14. Applicable mortality tables were not provided by statute or regulation at the time of Esden's distribution. *See* Retirement Protection Act of 1994, Pub.L. No. 103–465, § 767(a), 101 Stat. 4809, 5039 (adding statutory requirement and definition of "applicable mortality table"). However, they were specified by the Plan. *See Restated Plan* 91 Ex. A,¶ 2. The mortality assumptions form no part of this dispute.

of two violations. Either the plan must have employed a discount rate equal to the interest credit rate, and by hypothesis in excess of the prescribed "applicable rate," in violation of Code section 417(e) and ERISA section 205(g); or the plan must have projected the cash account balance forward at a rate less than the interest credits provided under the plan, thereby working a forfeiture under Code section 411(a)(2) and ERISA § 203(a)(2). *See* 1996-1 C.B. at 359-60. As set out below, we conclude that the Plan in this case worked just such a forfeiture.[15]

The Notice specifically addresses the problem of cash balance plans where the interest credits are tied to a variable outside index. *See id.* at 361. In such a case (*i.e.*, exactly Esden's case), two further requirements must be met. First, the plan must prescribe a method for deter-

mining the rate at which future interest credits will be applied to project the participant's accrued benefit as of normal retirement age. The method prescribed must preclude employer discretion in order to comply with the "definitely determinable benefits" requirement of Code section 401(a)(25).[16] There is no doubt that the Plan's prescription of a 4% projection rate satisfies this requirement.[17]

The Notice confirms that the benefits attributable to interest credits are accrued benefits, as that term is defined by Treasury Regulation § 1.411(a)-7(a). As a consequence, once they have accrued—provided that they have vested according to I.R.C. § 411(a)(2) and ERISA § 203(a)—they are nonforfeitable. *See* 1996-1 C.B. at 360 (Part III. A). Recognizing this, the Notice sets out a second requirement for

---

**15.** The Notice illustrates the problem of "whipsaw" with an example that approximates Esden's case.

> A cash balance plan provides for interest credits at a fixed rate of 8% per annum that are not conditioned on continued employment, and for annuity conversions using the section 417(e) applicable interest rate and mortality table. A fully vested employee with a hypothetical account balance of $45,000 terminates employment at age 45 and elects an immediate single sum distribution. At the time of the employee's termination, the section 417(e) applicable interest rate is 6.5%.
>
> The projected balance of the employee's hypothetical account as of normal retirement age is $209,743. If $209,743 is discounted to age 45 at 6.5% (the section 417(e) applicable interest rate), the present value equals $59,524.
>
> Accordingly, if the plan *paid the hypothetical account balance of $45,000, instead of $59,524, the employee would receive $14,524 less than the amount to which the employee is entitled.*

*Id.* at 360 (emphasis added).

**16.** I.R.C. § 401(a)(25) provides: "A defined benefit plan shall not be treated as providing definitely determinable benefits unless, whenever the amount of any benefit is to be determined on the basis of actuarial assumptions, such assumptions are specified in the plan in a way which precludes employer discretion." *See also* Treas. Reg. § 1.401(a)-1(b)(1) (requiring "definitively determinable benefits");

Rev. Rul. 79-90, 1979-1 C.B. 155 (stating that actuarial assumptions must be prescribed in plan so as to preclude employer discretion); Rev. Rul. 74-385, 1974-2 C.B. 130 (approving plan in which benefit accrued according to prescribed formula so as to preclude employer discretion).

**17.** It is disingenuous, however, for the Plan to claim that this is the *only* requirement. *See* Appellee Br. at 17 n. 11. Or to imply, as it also does, that Esden's demand that the lump-sum distribution projections employ a rate greater than 4% would violate this requirement. *See id.* at 17. "Projections" and "guesswork" are at the heart of any defined benefit plan—they are what the Plan's actuaries perform. To say a benefit formula precludes "employer discretion" and is at any time "objectively determinable" is not to say that it cannot involve "projections and guesswork" (a/k/a "actuarial assumptions"). For example, a plan that tied its interest credits to an outside index, and provided that valuation projections assume an interest credit equal to the average actual interest credit over a certain number of previous periods, would still meet the "definitely determinable" requirement and preclude employer discretion, even though that projection rate could not be ascertained in advance. *Cf.* Treas. Reg. § 1.401(a)(4)-8(c)(3)(v)(B) (allowing just such a methodology for determining the value of a variable interest rate to be used for projection of cash account balance at normal retirement age).

plans adopting variable interest rates, cautioning that

> in determining the amount of an employee's accrued benefit, a *forfeiture*, within the meaning of § 1.411(a)–4T, *will result* if the value of future interest credits is projected using a rate that *understates the value* of those credits or *if the plan by its terms reduces the interest rate or rate of return used for projecting future interest credits*.

*Id.* at 361 (emphases added). The cross-referenced regulation defines "forfeiture" in this context:

> For purposes of section 411 and the regulations thereunder, a right to an accrued benefit is considered to be unforfeitable at a particular time if, at that time and thereafter, it is an unconditional right.... [A] right which, at a particular time, is conditioned under the

plan upon a subsequent event, subsequent performance, or subsequent forbearance which will cause the loss of such right is a forfeitable right at that time.

Treas. Reg. § 1.411(a)–4T.

Here, by fixing the future interest credits at 4.0% for the purposes of projection—a full 1.5% less than the guaranteed minimum actual value of those credits—the Plan effects just such a forfeiture. In effect, the Plan conditions the right to receive the additional 1.5% interest on the form of distribution that the participant elects. What the Plan consistently characterized in the proceedings below as an innocuous "interim calculation" is exactly what the IRS interprets the regulations to forbid.[18]

.　　.　　.　　.　　.

**18.** Notice 96–8's confirmation that benefits attributable to interest credits are accrued benefits, *see* 1996–1 C.B. at 360, implicates another provision of ERISA. As accrued benefits, not only are the interest credits nonforfeitable once vested, *see* ERISA § 203(a)(2); I.R.C. § 411(a)(2), but they must also be taken into account in determining whether a cash balance plan complies with the benefit accrual requirements under ERISA section 204(b)(1) and Code section 411(b)(1). These sections provide three alternate tests, at least one of which every defined benefit plan must satisfy. In general, these provisions regulate the rate at which benefits may accrue under a plan; they do so to prevent plans from designing accrual schedules that circumvent the vesting rules by providing that the great preponderance of benefits accrues only in the last years of employment. *See generally* John H. Langbein & Bruce A. Wolk, *Pension and Employee Benefit Law* 153–54 (3d ed.2000) (explaining that being 100% vested after 5 years is small security if nearly all the benefits accrue only after 20 years employment).

In the Plan's case, these accrual requirements explain why the Plan sets a 5.5% minimum Interest Credit and give another reason why the 4% projection rate is improper. It is undisputed that the only test that the Plan might satisfy is the so-called 133⅓ percent test under ERISA section 204(b)(1)(B) and I.R.C. section 411(b)(1)(B). That test requires that the value of the benefit accrued in any year may not exceed the value of a benefit accrued in any previous year by more than 33%. *See* ERISA § 204(b)(1)(B); I.R.C. § 411(b)(1)(B).

The Plan's schedule of Annual Account Balance Credits is weighted heavily in favor of longer-tenured employees: at the end of her first year, a participant receives a credit of 3.25% of salary, but at the end of her twentieth year that credit has risen to 11%. However, while 11% is 338% of 3.25%, the Plan may still qualify under the 133⅓ percent test because of the value of the interest credits compounded annually through normal retirement age ("NRA"). Assume that the above employee was 30 years old on joining the Plan and assume further that her salary was $10,000. The value of her first credit of $325 projected forward at 5.5% to NRA is $2,007; the value of her twentieth credit of $1,100, projected forward at 5.5% to NRA is $2,456—or only 122% of the first year's benefit. In exactly this fashion, the Plan demonstrated compliance with ERISA § 204(b)(1)(B) and I.R.C. § 411(b)(1)(B) when it successfully sought a favorable determination letter from the IRS. However, it turns out that 5.5% is the lowest possible projection rate at which compliance remains possible. At that projection rate the benefit accrued in Year 20 is exactly 133% of the benefit in Year 14 (valued at $1,847 under the above assumptions). At any rate of Interest Credit below 5.5% the Plan is noncompliant. It is undisputed therefore that the Plan fails the 133⅓ percent test when a projection rate of 4% is used.

To remain compliant the right to receive the *full* 5.5% Interest Credit for *all years through NRA must accrue at the same time that the salary credit accrues*. However, this

■ Based on the foregoing construction of how the existing statutes and regulations apply to lump-sum distributions from cash balance plans we conclude: (1) in paying Esden her Cash Balance Account, the Plan did not pay her the actuarial equivalent of her normal retirement benefit (that is, her accrued benefit expressed as an annuity commencing at normal retirement age), in violation of ERISA § 203(e); I.R.C. § 411(a)(11), and Treas. Reg. § 1.411(a)–11(d), which make applicable the valuation rules of ERISA § 205(g)(3); I.R.C. § 417(e)(3) and Treas. Reg. § 1.417(e)–1(d); and (2) by making part of her benefit conditional on the form of payment chosen the Plan made that benefit forfeitable, in violation of ERISA § 203(a); I.R.C. § 411(a)(2) and Treas. Reg. § 1.411(a)–4T.

B. *Notice 96–8 represents the "fair and considered" position of the IRS and sets out a reasonable interpretation of the law as it applied at the time of Esden's termination.*

Notice 96–8's interpretation of how the existing regulatory scheme applies to cash balance plans represents the fair and considered judgment of the IRS and as such is entitled to deference. Further, we conclude that enforcing this regulatory scheme raises no problem of retroactivity, notwithstanding that the Notice was published after Esden's distribution in 1991. Lastly, we reject the Plan's contention that Notice 96–8 expressly grandfathers its conduct, immunizing it from a participant's suit under ERISA.

1. *The IRS's interpretation of its own regulations is entitled to deference.*

■ It is well-settled that "an agency's reasonable, consistently held interpretation of its own regulation is entitled to deference." *I.N.S. v. National Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189–90, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). "[P]rovided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Stinson v. United States*, 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (stating that courts "must defer to the [agency's] interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation'") (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430, 108 S.Ct. 1306, 99 L.Ed.2d 515 (1988)); 1 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.10, at 281–83 (3d ed.1994). Here, the district court apparently disregarded the IRS's interpretation of how the regulations promulgated under Code sections 411(a) and 417(e)—and the parallel provisions under ERISA sections 203(e) and 205(g)—apply to cash balance benefit plans. In effect, the district court enforced the terms of the Plan rather than the requirements of the regulations.

---

is exactly what the Plan's use of the reduced 4% projection rate denies. Under the Plan's terms, only a right to a 4% Interest Credit for all years through NRA can be said to accrue at the time the Annual Account Balance Credit accrues. Because the right to receive the marginal 1.5% Interest Credit is made conditional on the participant electing to leave her balance in the Plan, it does not accrue with the salary credit. Rather it accrues only as it is actually credited to the participant's bal-

ance. Under this accrual schedule the Plan no longer complies with the 133⅓ test.

At the very least, the Plan tries to have it both ways. For the purposes of demonstrating compliance with the 133⅓ percent test it represents that the right to receive all future Interest Credits at the full 5.5% minimum accrues simultaneously with the Annual Account Balance Credit. However, the actual mechanics of the Plan contradict this representation.

■ Although the IRS's guidance on how the existing regulatory framework applies to cash balance plans comes in a Notice, rather than in new regulations or a revenue ruling, such a consistent and reasonable interpretation by the responsible agency is entitled to deference, regardless of its form of publication. *See Auer v. Robbins*, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (agency's interpretation set forth in *amicus* brief was entitled to deference, where "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question"); *see also `Christensen v. Harris County*, 529 U.S. 576, 120 S.Ct. 1655, 1664, 146 L.Ed.2d 621 (2000) (Scalia, J., concurring) (collecting cases where Court accorded deference to authoritative agency positions set forth in various formats other than formal regulations). Here, the IRS's guidance in Notice 96–8 is consistent with its prior regulatory interpretations. It represents the agency's "fair and considered judgment on the matter" and is therefore entitled to deference.[19]

The district court stated that "[w]ith the exception of favorable determination letters issued on a case-by-case basis, the IRS has not yet issued any definitive interpretation nor adopted any definitive regulations to govern the administration of this type of defined benefit plan." *Esden II*, No. 2: 97–cv–114, at 6. This overlooked not only Notice 96–8, but also a set of final regulations that the IRS has issued, after notice and comment rule-making procedures, addressing cash balance plans and how they are to be valued.

These regulations establish valuation safe harbors for cash balance plans under the so-called "cross-testing" rules deployed to test whether a plan impermissibly discriminates in favor of highly-compensated employees. *See* Treas. Reg. § 1.401(a)(4)–8(c) (the "safe harbor regulations"). These safe harbor regulations were first published for comment in 1991 and were finally issued in September 1993. *See* 1996–1 C.B. at 360. As Notice 96–8 records, these regulations provoked considerable attention and comment among pension law practitioners precisely because they indicated the IRS's interpretation of how the existing statutes and regulations applied to cash balance plans:

> Comments on the September 1991 regulations expressed concern that the safe harbor plan design requirements reflected an interpretation by the Service and Treasury of the qualification requirements [*i.e.* existing law] that, in certain cases, *would require cash balance plans to pay a single sum distribution in excess of the hypothetical account balance.*

*Id.* (emphasis added); *see also* Nondiscrimination Requirements for Qualified Plans, 56 Fed.Reg. 47524, 47528 (1991) ("The Treasury and the Service have determined that [relief from 'whipsaw'] cannot be granted consistent with the requirements of section 417(e)").

Under the safe harbor regulations, the basis for the valuation is the projected hypothetical account as of normal retirement age. Treasury Regulation section 1.401(a)(4)–8(c)(3)(ii) provides that:

> The plan must provide that an employee's accrued benefit under the plan as of any date is an annuity that is the actuarial equivalent of the employee's projected hypothetical account as of normal retirement age, determined in accor-

---

**19.** Even if the IRS's position expressed in Notice 96–8 were not entitled to "Chevron-style deference," *Christensen*, 120 S.Ct. at 1662, it would still be "entitled to respect." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). *Skidmore* held that "rulings, interpretations and opinions" remain a "body of experience and informed judgment to which courts and litigants may properly resort for guidance," even when they do not authoritatively control courts. *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161.

dance with paragraph (c)(3)(vi) of this section.

In turn, paragraph (c)(3)(vi)(A) provides:

> The plan must provide that at any date at or before normal retirement age the accrued benefit (within the meaning of section 411(a)(7)(A)(i)) of each employee in the plan is an annuity commencing at normal retirement age that is the actuarial equivalent of the employee's hypothetical account as of normal retirement age (as determined under paragraph (c)(3)(v)(B) of this section.)

And that cross-referenced paragraph in turn requires:

> Under paragraph (c)(3)(vi) of this section, the value of an employee's hypothetical account must be determined as of normal retirement age in order to determine the employee's accrued benefit as of any date at or before normal retirement age.

Treas. Reg. § 1.401(a)(4)–8(c)(3)(v)(B). These provisions establish that the value of the plan's "accrued benefit" must be expressed as an annuity that is the "actuarial equivalent" of the projected hypothetical balance at normal retirement age. This framework is consistent with Notice 96–8 and with the interpretation of the regulatory framework on which Esden bases her claim for relief.

Furthermore, the safe harbor regulations are consistent with Notice 96–8 in determining how the cash balance at normal retirement age is to be projected. The cash balance plan's benefit formula must provide that each account is automatically credited with a qualifying interest rate that *precludes* forfeiture.

> This requirement is not satisfied if any portion of the interest adjustments to a hypothetical allocation are contingent on the employee's satisfaction of any requirement. *Thus, for example, the interest adjustments to a hypothetical allocation [i.e., a cash balance account] must be provided through normal retirement age, even though the employee*

*terminates employment or commences benefits before that age.*

Treas. Reg. § 1.401(a)(4)–8(c)(3)(iv)(A) (emphasis added). As to the projection rate to be employed in determining the value of the hypothetical account as of normal retirement age when the plan adopts a variable interest rate, the plan must specify whether it assumes that the "value of the variable interest rate for all future periods is either the current value of the variable interest rate for the current period or the average of the current values of the variable interest rate for the current period and one or more periods immediately preceding the current period (not to exceed 5 years in the aggregate)." Treas. Reg. § 1.401(a)(4)–8(c)(3)(v)(B). It is incompatible with this regulation to employ an interest rate that is necessarily outside the range of any possible actual interest credit under the plan, solely for the purposes of projecting the value of the hypothetical account balance at normal retirement age. "Fix[ing]," *Esden I*, 182 F.R.D. at 438 (internal quotations omitted), the interest rate for projection purposes, as the district court approved, is impermissible.

Finally, in general, for the purposes of testing under these safe harbor regulations, a plan may determine actuarial equivalence by using a standard mortality table and an interest rate equal to the interest rate specified in the plan for making interest adjustments to the cash balance. *See* Treas. Reg. § 1.401(a)(4)–8(c)(3)(vi)(C) (Determination of actuarial equivalence). That is, for the purposes of the test only, a plan may assume a discount rate equal to the interest credit rate. However, the plan must still provide that if it allows for alternative distributions subject to the interest rate restrictions of section 417(e), it must pay out at least the "actuarial present value (calculated in accordance with § 1.417(e)–1(d)) of the employee's accrued benefit." Treas. Reg. § 1.401(a)(4)–8(c)(3)(vii)(C)(2). Thus for the purposes of showing compliance with

cross-testing for nondiscrimination, the plan may assume reasonable actuarial assumptions, but for the purposes of *an actual* distribution, it must still use the prescribed assumptions, including the 417(e) applicable rate.

In valuing the accrued benefit of a cash balance plan with reference to the projected value of the hypothetical account balance at normal retirement age, the safe harbor regulations adopt the same conceptual framework as Notice 96–8. Further, those regulations restrict the permissible projection rate and the discount rate in a manner identical to Notice 96–8. We conclude that the guidance in Notice 96–8 represents the IRS's consistent interpretation of how lump-sum distributions from cash balance accounts should be valued.[20]

Rather than referring to the final regulations (Treas.Reg. § 1.401(a)(4)–8(c) *et seq.*) and guidance (Notice 96–8) that the IRS has issued on cash balance plans, the defendant Plan invites the Court to reason by analogy to other account-based benefit determinations. This argument is unconvincing. First, there is no reason to look to "analogous account-based benefit determinations," when there is guidance directly on cash balance plans. Second, the dispute is not over what a "better" regulatory regime, more accommodating to the design objectives of cash balance plans might look like; the dispute is over how to apply the existing regulations to this Plan. Third, the

statutory scheme to which the defendant refers the Court is simply inapposite. *See* ERISA § 204(c)(2); I.R.C. § 411(c). These provisions operate (1) to value *actual employee* contributions to defined benefit plans (which are always 100% vested, *see* ERISA § 203(a)(1); I.R.C. § 411(a)(1)), not hypothetical employer credits; and (2) to guarantee that those actual contributions will have earned a minimum return within the plan. Their focus, therefore, is on the proper valuation (including a reasonable investment return) of employees' *actual* past contributions, not the present valuation of accrued future benefits promised by the employer.

2. *Notice 96–8 interprets the law as it applied at the time of Esden's termination.*

 The Plan contends that following Notice 96–8 improperly subjects the Plan to a retrospective application of a subsequent interpretation. We disagree. Because Notice 96–8 is an authoritative interpretation of existing statutes and regulations, we hold that it is valid guidance on the law as it applied at the time of Esden's lump-sum distribution. *Cf. Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 303 (2d Cir.1971) ("To the extent that a regulation interprets or elucidates the meaning of a statute, it is merely explanatory or confirmatory rather than retroactive."[21]);

20. In support of her Rule 59(e) motion to alter and amend the Judgment, Esden appended material from a 1997 IRS Coursebook. The IRS prepared that teaching material to train its Employee Plans Specialists to analyze correctly whether cash balance plans comply with the various existing statutory and regulatory requirements. Esden excerpted an example from that material in her main brief, *see* Appellant Br. at 28–30, and included the material in full in the Joint Appendix. In the district court, the Plan did not object to the submission of this material, but has filed a motion in this Court to strike the material from the brief and from the Joint Appendix. While we note that the material fully supports Esden's position, and confirms the consistency with which the IRS has interpreted the statutes and regulations to apply to cash bal-

ance plans, we do not—and need not—rely on this material in reaching our decision. It largely recapitulates and illustrates further the guidance provided by Notice 96–8. The Plan's motion is therefore denied as moot.

21. We note that Taxpayer Bill of Rights 2, Pub.L. No. 104–168, § 1101(a), 110 Stat. 1452, 1468 (1996), amended Code section 7805 to provide significant relief from the retroactive application of Treasury regulations. However, that Act does not alter our conclusion here. First, the restrictions on retroactivity imposed by the Taxpayer Bill of Rights are limited to Regulations and do not affect rulings. Second, and more importantly, they only affect Regulations relating to statutory provisions enacted on or after July

see also *Dickman v. Commissioner,* 465 U.S. 330, 343, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984) (Commissioner may change an earlier interpretation of the law when he concludes that his previous interpretation was erroneous, notwithstanding taxpayer reliance) (citing *Dixon v. United States,* 381 U.S. 68, 72–75, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965) (same)).[22]

### 3. The Plan mischaracterizes the significance and effect of Notice 96–8

Recognizing that Notice 96–8 fully supports plaintiff's position, the Plan seeks to minimize its significance, arguing that the Notice was published for discussion in advance of publishing proposed regulations. It therefore contends that Esden may not rely on the Notice "to enforce a personal right to more Plan benefits under ERISA." Appellee Br. at 38–39. Further, it contends that even were Notice 96–8 held to be a valid interpretation of the law, it expressly "grandfathers" plans that have made lump-sum distributions "based on reasonable, good-faith interpretation of the applicable provisions of the Code." 1996–1 C.B. at 363. We disagree.

First, Notice 96–8 cannot be discounted as merely a discussion document, inviting comment in advance of future regulations. It is only the final section of the Notice that describes proposed safe harbor regulations. *See* 1996–1 C.B. at 362 ("IV. Description of Proposal"). The rest of the Notice describes the existing regulatory scheme and explains how the IRS interprets this to apply to cash balance plans.

Second, even if the Plan could show that it had adopted a "reasonable, good-faith interpretation of the applicable provisions of the Code," *id.* at 363, Notice 96–8 would grandfather it only against disqualification for tax purposes. The Plan's contention that Notice 96–8 grandfathers it from liability to a plan participant bringing suit under ERISA is frivolous.

Finally, even if we were to disregard Notice 96–8, we would reach the same result, as explained above, on the basis of the governing statutes and regulations. The Plan was drafted to accomplish what the statutes and regulations forbid.

### C. Arguments that Esden received the benefit of her bargain, or that she chose to forfeit a portion of her future interest credits are without merit.

Defendant correctly states that "[t]here is no dispute that the benefit each participant received from the Plan was exactly what he or she was promised." Appellee Br. at 11. The district court also relied on this reasoning. *See Esden I,* 182 F.R.D. at 438 ("Using a 4% rate to project future interest credits ensures that the Cash Balance Account does what it promises to do . . . ."). But whether Esden received what the Plan promised is not the issue. The issue is whether the Plan's terms complied with the law. They did not.

ERISA was enacted to restrict employers' and employees' freedom of contract when bargaining over pensions. Employers do not have to provide pension plans, but when they do, those plans must comply with Title I of ERISA.[23] *See*

---

30, 1996. *See* Pub.L. No. 104–168, § 1101(b), 110 Stat. 1452, 1469 *reprinted as note following* I.R.C. § 7805. All of the statutory provisions at issue in this case were enacted before July 30, 1996.

**22.** We realize that in some areas the regulation of cash balance benefit plans remains uncertain. But with respect to the valuation methodology at the heart of this case, the regulations are not uncertain and the IRS's position has been consistent. Further, it is the sponsors of these plans that bear the risk of regulatory uncertainty. *See Helvering v. Reynolds,* 313 U.S. 428, 433, 61 S.Ct. 971, 85 L.Ed. 1438 (1941) (a taxpayer, when operating in an area of unsettled law, can claim no "vested interest in a hypothetical decision in [its] favor prior to the advent of the regulations").

**23.** Title I of ERISA governs the "Protection of Employee Benefit Rights." Each of the ERISA sections on which we rely appears in Title I.

ERISA § 4(a) (with limited exceptions not here relevant, Title I of ERISA "*shall* apply to *any* employee benefit plan" (emphasis added)). Further, if a plan seeks the tax benefits afforded a qualified pension plan, it must comply with the requirements imposed by Code section 401 *et seq.* A defined benefit pension plan, including one adopting a cash balance format, need not offer a lump-sum distribution as an optional form of benefit, *see Morales v. Pan Am. Life Ins. Co.*, 914 F.2d 83, 88 (5th Cir.1990); *Ashley v. Hays*, 647 F.Supp. 251, 253 (S.D.Tex.1986), but when it does so provide, that distribution must be the actuarial equivalent of the accrued benefit valued according to the statutory methodology. The Plan is correct that a pension benefit is defined according to the terms of the plan; but ERISA is quite explicit that those terms are circumscribed by statutory requirements and restrictions. The Plan cannot contract around the statute. *See* ERISA § 404(a)(1)(D) (documents and instruments governing plan may only be enforced insofar as they "are consistent with the provisions of [ERISA Titles I and IV]").

■ We find similarly unpersuasive the district court's explanation that the Plan did not cause Esden to "forfeit her right to earn future interest credits; Esden herself made that decision." *Esden II*, No. 2: 97–cv–114, at 6. A participant may not elect a forfeiture. The anti-forfeiture provisions of ERISA are drafted as mandatory terms. *See, e.g.*, ERISA § 203(a) ("Each pension plan *shall* provide that an employee's right to his normal retirement benefit is nonforfeitable . . . ."); I.R.C. § 411(a) (same). The statutes nowhere provide for an exception allowing a plan to offer an employee the voluntary choice of a partial forfeiture in exchange for a particular form of payment. *See* Treas. Reg. § 1.411(a)–4(a) (conditional rights are forfeitable rights and not within the definition of "the term 'nonforfeitable'· for the purposes of [section 411(a)'s] requirements") Such restrictions on the em-

ployee's freedom of contract permeate ERISA. *Cf., e.g.*, ERISA § 206(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.").

### D. The valuation requirements apply to all distributions from a plan, not just to determining whether consent is required.

The Plan's next argument on this appeal is that the regulations prescribing the valuation methodology exceed the scope of the statute. Defendant contends that "[t]he only provisions dealing with the determination of lump sum amounts under the statutes when Esden received her benefit, were limited by their terms to contexts in which consent was required to 'cash out' a benefit." Relying on arguments set out in *Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan*, 66 F.Supp.2d 1328 (N.D.Ga.1999), the Plan suggests that insofar as the valuation regulations are applied for purposes other than determining whether a lump-sum distribution requires a participant's consent, they are invalid under a *Chevron* analysis. We reject this argument for two reasons. First, it fails on its merits. *Accord Lyons*, 221 F.3d at 1244–49. Second, even if the argument were persuasive, it would not help this Plan, in this case. The Plan's terms expressly contract for the valuation framework it now seeks to disavow.

In *Lyons*, the court addressed a claim similar to Esden's, brought by a participant in a cash balance plan. Jerry Lyons alleged that the lump-sum distribution he received, in an amount equal to the balance of his cash balance account ($36,-109.15), was less than the present value of his normal retirement benefit properly calculated under the regulations ($49,341.83). *See* 66 F.Supp.2d at 1332. The *Lyons* court correctly analyzed the controlling regulations and conceded that Notice 96–8 required the calculations that Lyons alleged. *See id.* at 1332 n. 4. Notwithstand-

ing this regulatory framework, the *Lyons* court refused to countenance what it considered to be a "computational contrivance that has only slight connection to economic reality." *Id.* at 1336. It therefore found that the valuation regulations were an unreasonable interpretation of ERISA § 203(e) and I.R.C. § 411(a)(11).

The *Lyons* court found ERISA § 203(e) to apply without ambiguity only to those lump-sum distributions where consent was not required—at that time, as at the time of Esden's distribution, those less than $3,500.[24] *See Lyons,* 66 F.Supp.2d at 1333. It held that the valuation rules promulgated under authority of ERISA § 203(e) and I.R.C. § 411(a)(11) had been extended to cover all distributions in a manner that was unreasonable under a *Chevron* analysis. *See id.* at 1334–36. It, therefore, invalidated the regulations insofar as they applied to lump-sum distributions requiring the participant's consent. Because Jerry Lyons had consented, it held that his distribution was governed by the terms of the plan, not the invalidated regulations. *See id.* at 1334–36.

 We do not agree. ERISA § 203(e) may be inartfully drafted.[25] But under *Chevron* principles, an imprecisely drafted statute simply obliges a court to consider whether an agency's construction is reasonable. For, as to the "precise

question at issue," if the "intent of Congress is clear" from the statute, then "that is the end of the matter." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

Here, the statute is ambiguous. While ERISA § 203(e)(1) allows involuntary cash-outs of amounts less than $3,500, the following paragraphs are inconsistent with *Lyons'* interpretation that the statutory valuation rules apply only to those involuntary cash-outs. In prescribing the statutory discount rates, ERISA section 203(e)(2)(A) refers to amounts both greater than $25,000 and those less than or equal to $25,000. As a matter of logic, therefore, subparagraph (A) anticipates the valuation of *any* amount. Further, if Congress had wanted to limit these valuation rules only to amounts less than the $3,500 consent-limit set out in ERISA § 203(e)(1), it would not have drafted section 203(e)(2) broadly enough to value *all* amounts, nor would it have established $25,000 (an amount that could never be relevant under the *Lyons* court's reading

**24.** The $3,500 limit has since been amended to $5,000. *See* Taxpayer Relief Act of 1997, Pub. Law No. 105–34, § 1071, 111 Stat. 788, 948 (amending, *inter alia,* I.R.C. §§ 411(a)(7)(B), (a)(11)(A), 417(e)(1), (2), and ERISA §§ 203(e)(1), 204(d)(1), 205(g)).

**25.** At the time of Esden's distribution, ERISA § 203(e) provided:

(e) **Consent for distribution; present value; covered distributions**

(1) If the present value of any nonforfeitable benefit with respect to a participant in a plan exceeds $3,500, the plan shall provide that such benefit may not be immediately distributed without the consent of the participant.

(2)(A) For purposes of paragraph (1), the present value shall be calculated—

(i) by using an interest rate no greater than the applicable interest rate if the

vested accrued benefit (using such rate) is not in excess of $25,000, and

(ii) by using an interest rate no greater than 120 percent of the applicable interest rate if the vested accrued benefit exceeds $25,000 (as determined under clause (i)).

In no event shall the present value determined under subclause (II)[sic] be less than $25,000.

(B) For purposes of subparagraph (A), the term "applicable interest rate" means the interest rate which would be used (as of the date of the distribution) by the Pension Benefit Guaranty Corporation for purposes of determining the present value of a lump sum distribution on plan termination.

ERISA § 203(e) (as in effect in 1991). *See also* I.R.C. §§ 411(a)(11) (as in effect in 1991).

of the statute) as the level at which a more aggressive discount rate became permissible.

Further, the legislative history accompanying the Tax Reform Act of 1986, which introduced these consent and valuation restrictions, evidences a congressional intent to apply these valuation rules to all distributions. *See* H.R. Conf. Rep. No. 99–841, pt. 2, at 488 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 4075, 4576, *reprinted in* 1986–3 C.B. Vol. 4 at 488 (using an illustrative example of an employee with a $50,000 accrued benefit). And, in 1994, when Congress amended these provisions to replace the PBGC rate with the 30–year long-bond rate, it explained again its intention:

> Congress adopted the interest rate cap to prevent plans from using unreasonably high interest rates to determine the present value of participants' benefits. *If plans could use high interest rates, plans could lower the single sum paid to participants.*

H.R. Rep. No. 103–632, pt. 2, at 57 (1994) (emphasis added) reprinted in 1994. If there were no regulation of the discount rates that plans could use in calculating lump sum equivalents of accrued normal retirement benefits, they could eviscerate the protective provisions of ERISA.

 We conclude that the valuation rules applying the statutory "applicable interest rate" to all distributions, regardless of consent, *see, e.g.,* Treas. Reg. § 1.411(a)–11(a)(1), adopt a reasonable interpretation of the statutes, consistent with both express congressional intent and the general protective purpose of ERISA. *See generally* ERISA § 2 (declaration of congressional findings and policy); *Geller v. County Line Auto Sales, Inc.,* 86 F.3d 18, 22 (2d Cir.1996) (noting broad protective purpose of ERISA). Therefore, under the well-established principles of *Chevron,* we must enforce them.

Even if the regulations were invalid as beyond the scope of the statute, that would not alter the outcome of *this* case. By its own terms, at the time of Esden's distribu-

tion, the Plan provides that the "Actuarial Equivalent" of any benefit will be determined by applying the "PBGC interest rate structure for deferred annuities." By contract, the Plan expressly adopted the applicable rate then prescribed by the statutes and regulations.

We conclude that there is no merit to the argument that the regulations are invalid.

E. *The favorable determination letters cannot be relied on as proof that the IRS has ruled that the Plan complied with ERISA.*

 Finally, the Plan argues that the only "pertinent guidance" that the IRS has issued with respect to the Plan is to issue the two favorable determination letters. The Plan contends that because these letters are "a construction and application of the regulations by the administrative agency charged with their enforcement ... [they] are entitled to great weight." The district court, while denying that the determination letters were "outcome determinative" considered that they were "entitled to at least the weight accorded other expert testimony." *Esden I,* 182 F.R.D. at 439. We disagree.

First, we repeat that the determination letters are not the only "pertinent guidance" that the IRS has issued. This assertion disregards the "guidance" provided by the safe harbor regulations and Notice 96–8 itself.

 Second, private letter rulings are of limited evidentiary weight. The Code expressly provides that "a written determination may not be used or cited as precedent." I.R.C. § 6110(k)(3); *see also* Treas. Reg. § 301.6110–7(b). The district court and the Plan cite *Amato v. Western Union Int'l, Inc.,* 773 F.2d 1402, 1412–13 (2d Cir. 1985), for the proposition that this Circuit has considered determination letters to be of "some weight." *Amato,* however, deals with a fundamentally different situation.

In *Amato*, the IRS considered the legality of a plan amendment; it applied rules clearly established in its regulations and revenue rulings and determined that the plan no longer qualified under I.R.C. § 401(a). *See* 773 F.2d at 1412. There was, therefore, no doubt that the determination letter considered exactly the same issue that came before this Court on appeal and expressly found a regulatory violation. Here, in contrast, there is no indication that, in issuing the determination letters approving the Plan, the IRS key district director considered the specific issue we must decide. *Accord Lyons v. Georgia–Pacific Corp. Salaried Employees Retirement Plan*, 221 F.3d 1235, 1252 (11th Cir.2000) ("Because it does not specifically address the issue at hand, the IRS letter is not owed any deference.").

A determination letter can only ever apply the law to the particular factual record presented by the applicant. Here, in 1990 when the IRS first reviewed the Plan's conversion to a cash balance format, the key district director specifically asked for a demonstration of how the Plan's benefit formula "meets the requirements of the IRS Code Sect. 411(b)(1) (Accrual Rules)." The Plan's actuary demonstrated this compliance in an analysis that assumed a 5.5% minimum Interest Credit, but nowhere documented that assumption. In the same submission, the Plan purported to show compliance with Code section 411(b)(1)(G) through reference to the 4% projection rate incorporated into the Cash Balance Account Annuity formula. The IRS did not expressly ask the Plan to demonstrate compliance with the lump-sum distribution requirements imposed by Code sections 411(a) and 417. We find no reason to defer to a determination letter that (a) is in part based on contradictory and misleading representations submitted by the applicant, *cf. Shatto v. Evans Prods. Co.*, 728 F.2d 1224, 1228 n. 2 (9th Cir.1984) (IRS determination letter entitled to no deference because based on limited information provided by the defendant applicant); IRS Publication 794 (Rev.

March 1990) ("[Favorable] determination letter will not provide reliance if . . . there has been a misstatement or omission of material facts."), and (b) did not consider the issue raised by the case.

Finally, the Plan's reliance on determination letters cannot shield it from liability in a suit brought by a plan participant for violations of ERISA. *Accord Lyons*, 221 F.3d at 1252–53. A favorable determination letter indicates only that an employee retirement plan qualifies for favorable tax treatment by meeting the formal requirements of I.R.C. § 401(a). *See* IRS Publication 794. In both 1990 and 1995, the determination letter issued expressly stated: "[t]his letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other federal or local statutes." Even if the Plan can rely on the favorable determination letters as a defense against any future IRS challenge to its qualified status, the determination letters do not bar plan participants from asserting their rights under ERISA. "The law permits plan participants whose rights are violated by the terms of a plan (or a plan amendment) to recover benefits—even if the plan has received a favorable ruling from the service." *Hearings on Hybrid Pension Plans Before the Senate Comm. on Health, Education, Labor and Pensions*, 106 Cong. (1999) (prepared testimony of Stuart Brown, Chief Counsel, IRS).

It could not be otherwise. In enacting ERISA, Congress expressly recognized the limited protection that the previous regulatory regime had provided for pension participants. That regulatory scheme had relied solely on the tax incentives provided to qualified plans and the IRS's power to disqualify noncompliant plans. *See, e.g.*, H.R.Rep. No. 93–533 (1974) *reprinted in* 1974 U.S.C.C.A.N. 4639, 4642 ("The Internal Revenue Code provides only limited safeguards for the security of anticipated benefit rights in private plans since its

primary functions are designed to produce revenue and to prevent evasion of tax obligations."). Under ERISA, to correct this lack of safeguards, Congress created substantive rights for pension plan participants and expressly created private causes of action in federal court to vindicate those rights. *See* ERISA § 502(a) (setting out private rights of action), (f) (establishing federal question jurisdiction without regard to citizenship of the parties or amount in controversy). An erroneous ruling by an IRS key district director, especially when procured by submission of limited or confusing information, cannot defeat the express statutory rights of plan participants. The adjudication of those rights is for the federal courts, not the field offices of the IRS.

## CONCLUSION

For the foregoing reasons the judgment of the district court is REVERSED and the case is REMANDED for further proceedings to calculate class damages. It shall be for the district court in the first instance to determine the proper projection rate for the calculation of damages, provided only that in no event may that projection rate be less than the minimum 5.5% guaranteed under the terms of the plan.